UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

APPALACHIAN VOICES,
CENTER FOR BIOLOGICAL DIVERSITY,
and SIERRA CLUB,
Plaintiffs,

v.

No. 3:24-cv-00411-CLC-DCP

TENNESSEE VALLEY AUTHORITY,
Defendant.

---

**TENNESSEE VALLEY AUTHORITY'S MEMORANDUM IN SUPPORT OF ITS MOTION TO STAY PENDING APPEAL**

---

Maria V. Gillen
Associate General Counsel
F. Regina Koho
Lane E. McCarty
Steven C. Chin
OFFICE OF THE GENERAL COUNSEL
Tennessee Valley Authority
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1401
Telephone 865.632.7741
mvgillen@tva.gov

Attorneys for Tennessee Valley Authority

## INTRODUCTION

Defendant Tennessee Valley Authority ("TVA") respectfully moves for a stay of the Court's order of vacatur (Doc. 68 *SEALED*) pending appeal. It is unclear from the face of the order whether the result of the Court's decision is a stop-work order for the construction of the Kingston gas plant that is the subject of the vacated Environmental Impact Statement ("EIS") and Record of Decision ("ROD"). If it is, this will have disastrous consequences, causing the furlough of thousands of workers; unrecoverable expenses for TVA of over half a billion dollars; impairment of warranties and risk of damage to equipment already purchased and delivered to the site; and additional harms to TVA that are impossible to quantify. TVA intends to pursue an expedited appeal of this Court's decision, so resolution of these significant legal issues will be dealt with soon. But TVA faces irreparable harm if it must halt construction in the interim. So, too, does the public. By contrast, Plaintiffs face none: their alleged harms do not stem from the construction of the new plant. Accordingly, the Court should grant a stay pending TVA's expedited appeal. TVA respectfully requests a ruling on this stay request by September 15, 2026, and has simultaneously moved for expedited briefing on this motion in order to meet that timeline.

## PROCEDURAL BACKGROUND

In 2021, TVA announced its plan to retire the nine coal-fired units at its Kingston Fossil Plant and construct replacement generation. As permitted by the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4321 et seq., TVA identified a preferred alternative—retiring Kingston's coal units and replacing them with gas-fired generation. Because of the complexities involved in securing a fuel source for the preferred alternative, TVA entered into a precedent agreement ("PA") with East Tennessee Natural Gas ("ETNG") that would begin this process. The PA was not entered into until after TVA's NEPA process had begun through the publication of a

Notice of Intent to prepare an EIS. AR Doc. 1 at 1. In accordance with NEPA, TVA completed its comprehensive review of the potential environmental impacts of the proposed action and published its final EIS in February 2024. In April 2024, TVA's then President and CEO Jeff Lyash signed the ROD that made the final decision to adopt the preferred alternative.

Six months later, on October 10, 2024, Appalachian Voices, Center for Biological Diversity, and Sierra Club ("Plaintiffs") brought this action, alleging (as is pertinent here) that TVA violated NEPA by failing to adequately evaluate significant environmental impacts associated with its decision to retire the coal-fired units at Kingston and replace them with gas-fired generation; by failing to evaluate reasonable alternatives within the EIS; and by predetermining the gas plant option based on TVA's entry into a PA with ETNG. In the almost two years this litigation has been pending, Plaintiffs never moved to enjoin construction of the gas plant.

Both parties filed competing motions for summary judgment, on which this Court recently ruled and entered judgment. (Docs. 67 & 68 *SEALED*.) Although finding that TVA took the "hard look" at the environmental consequences of its proposed action and alternatives (*see* Mem., Doc. 67 *SEALED* at PageID## 1215–18)—which is "the 'heart' of the NEPA analysis," *W. Watersheds Project v. Vilsack*, No. 23-8081, 2024 WL 4589758, at *15 (10th Cir. Oct. 28, 2024)—this Court nonetheless set aside and vacated TVA's EIS and the ROD. Specifically, the Court ruled: (1) that TVA did not consider a reasonable range of alternatives because two of the three alternatives the EIS studied in detail "did not meet the purpose and need of the project" (Mem., Doc. 67 *SEALED* at PageID# 1214); (2) that "TVA violated NEPA's timing requirements through its ETNG contract because it was precommitted to the decision before even beginning the NEPA Process and before writing its Draft EIS" (*id.* at PageID# 1230); and (3) that vacating the

EIS and the ROD was the appropriate remedy because these errors were not "technical," but were instead "fundamental to the analysis." (*Id.* at PageID# 1248.)

As set forth more fully below, stopping work would irreparably harm TVA and the public. It would impede TVA's ability to meet the growing electricity demand for its service territory and risk disruption in the supply of electricity upon which the public depends. It would lead to the furlough of approximately 2,000 workers and stop their paychecks. It would impose additional costs on TVA that could amount to almost half as much as the gas plant project itself. It will also impose additional costs that are difficult to quantify, such as impairment of equipment warranties and risk of damage to delivered equipment. If the Court's order is not stayed and TVA must stop work, the harms to the public and to TVA would be irreparable.

**ARGUMENT**

When determining whether a stay should be issued pending appeal, "a trial court should apply 'the same four factors that are traditionally considered in evaluating the granting of a preliminary injunction.'" *United States v. Xiaorong You*, No. 2:19-CR-14, 2020 WL 1932360, at *1 (E.D. Tenn. Apr. 21, 2020) (quoting *Michigan Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991)). "These well-known factors are: (1) the likelihood that the party seeking the stay will prevail on the merits of the appeal; (2) the likelihood that the moving party will be irreparably harmed absent a stay; (3) the prospect that others will be harmed if the court grants the stay; and (4) the public interest in granting the stay." *Griepentrog*, 945 F.2d at 153. "These factors are not prerequisites that must be met but are interrelated considerations that must be balanced together." *Id.* However, the first two factors "are the most critical." *Nken v. Holder*, 556 U.S. 418, 434 (2009). For the reasons outlined below, the Court should grant TVA's motion for a stay pending appeal.

## I. A stay pending appeal is proper because TVA is likely to succeed on the merits as to the three claims on which Plaintiffs were granted summary judgment.

Although the party seeking a stay "need not always establish a high probability of success on the merits, the party is still required to show, at a minimum, serious questions going to the merits." *Griepentrog*, 945 F.2d at 153–54 (citation modified). For the reasons outlined below, TVA can show serious questions going to the merits of the Court's ruling on reasonable alternatives; predetermination; and vacatur. Thus, this factor, one of "the most critical," *Nken*, 556 U.S. at 434, weighs in favor of granting the requested stay.

### A. Reasonable alternatives

The Court initially found that the EIS's "purpose-and-need statement is in line with TVA's statutory mandate [and] broad enough in that it essentially requires nothing more than a reliable source of generation that is able to meet the needs of the region while allowing the retirement of the fossil plant." (Mem., Doc. 67 *SEALED* at PageID# 1210.) This finding was correct and should have further informed the Court's analysis of whether TVA's study of two alternatives was reasonable. But the Court instead focused on NEPA's use of the term "range." Although acknowledging that many courts have found that a reasonable range of alternatives can consist of a no-action and one action alternative, the Court concluded that the Fiscal Responsibility Act ("FRA"), which amended NEPA in 2023 towards the end of TVA's NEPA process, changed the playing field and required an agency to "consider multiple alternatives (more than one)" in an EIS. (*Id.* at PageID# 1213.) This conclusion is mistaken.

Prior to the FRA, NEPA required an EIS to include "alternatives to the proposed action." 42 U.S.C. § 4332(C)(iii) (2022). The amended language requires an EIS to include "a reasonable range of alternatives to the proposed agency action . . . that are technically and economically feasible and meet the purpose and need of the proposal." 42 U.S.C. § 4332(C)(iii). With this

amendment, Congress directed agencies to analyze "a reasonable range of alternatives" that are both "feasible" and "meet the purpose and need of the proposal." The crux of this provision is the "alternatives"—not "reasonable range." Appropriate alternatives are derived from the purpose and need for the proposal, and, in some cases, there may be no feasible alternative at all; accordingly, there may be no alternatives from which to select a range. If multiple feasible alternatives exist, the "reasonable range" limits what the agency must evaluate—it need not evaluate every conceivable "alternative" but may limit its review to feasible alternatives as a reasonable range. As the Supreme Court recently instructed, a court's focus should be on whether the range of alternatives studied is "reasonable," not whether they meet a numerical threshold. *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Co.*, 605 U.S. 168, 182–83 (2025) ("When assessing significant environmental effects and feasible alternatives for purposes of NEPA, an agency will invariably make a series of fact-dependent, context-specific, and policy-laden choices . . . Courts should afford substantial deference and should not micromanage those agency's choices so long as they fall into a broad zone of reasonableness."). Contrary to the Court's interpretation, the purpose of the FRA amendment was to codify—and preserve—agency flexibility in determining which alternatives are appropriate to evaluate. The Court's focus on "range" removes this flexibility.

Several canons of construction also support TVA's interpretation and weigh against the Court's. The Court's focus on the plural use of "alternatives" runs afoul of the number canon, which posits that the use of the singular includes the plural and vice versa. *See, e.g.*, *Cent. & S. Motor Freight Tariff Ass'n, Inc. v. United States*, 843 F.2d 886, 894 (6th Cir. 1988) ("That argument violates a basic principle of statutory interpretation—that the singular includes the plural and the plural includes the singular. 1 U.S.C. § 1."). This canon is codified by the Dictionary Act,

1 U.S.C. § 1. So, an agency's conclusion that there is only one action alternative that is feasible is consistent with the plain meaning of the statute.

The Court's construction will also lead to absurd results, which courts should avoid. *See, e.g.*, *United States v. Turkette*, 452 U.S. 576, 580 (1981) (instructing that statutes should be construed to avoid absurd results). For one, it will require agencies to create alternatives out of whole cloth when the reality of the situation is that only one is feasible. The Court's holding might prompt agencies to "pad" their environmental reviews with extraneous alternatives to meet an arbitrary number. This would run counter to the motivation for the recent amendments meant to streamline NEPA reviews. *See, e.g.*, NEPA Law & Litig. § 2:1.50 (2025) (recognizing that FRA amendments qualified and narrowed NEPA's core mandate regarding the preparation of environmental impact statements).

In addition, Congress is presumed to act with awareness of prior interpretations of the law. *See Fluor Corp. & Affiliates v. United States*, 126 F.3d 1397, 1404 (Fed. Cir. 1997). Thus, it is presumed that the FRA merely codified long-standing interpretation of the statute and existing regulatory language, not effected a wholesale change to existing principles without so stating. And when the Council on Environmental Quality ("CEQ") added language defining reasonable alternatives as a reasonable range of alternatives that are technically and economically feasible and meet the purpose and need to its regulations in 2020, its stated intent was to codify CEQ guidance dating back to 1981 on the appropriate range of alternatives. *See* Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 43304, 43351 (July 16, 2020). Congress took this language from CEQ's regulation and enshrined it in NEPA via the FRA amendment.

Subsequent action by CEQ reinforces this view. Shortly after the FRA's enactment in 2023, CEQ updated its regulations to comport with the statutory amendments. CEQ retained the language defining reasonable alternatives as a reasonable range of alternatives that are technically and economically feasible and meet the purpose and need. 40 C.F.R. § 1508.1(z)(hh) (2024). Significantly, CEQ noted that the amendments "largely codify longstanding principles that EISs should include discussion of . . . a reasonable range of alternatives to the proposed action." National Environmental Policy Act Implementing Regulations Revisions Phase 2, Proposed Rule, 88 Fed. Reg. 49924, 49924–25 (July 31, 2023).

In sum, the Court's reading of NEPA's alternatives requirement is not in accord with the statute's plain text, canons of construction, or NEPA's legislative and regulatory history. In addition, the Court's alternatives conclusion does not square with the Court's findings that TVA framed a proper purpose and need for the proposed project and took the requisite "hard look" at the environmental impacts of the project by conducting a thorough analysis of options.

### B. Predetermination

TVA can show serious questions going to the merits of the Court's predetermination ruling for several reasons. First, the Court ignored a key term—the "Kingston Project"—in its analysis, which caused it to make a faulty conclusion. Section 9(B)(ii) of the PA provides one of the conditions precedent for TVA's performance obligations under the agreement. Specifically, it requires the "completion by July 31, 2023 of environmental reviews and required agency consultations for the construction of *the Kingston Project* in order to meet requirements under" various environmental laws. AR Doc. 524 at 55179–80 (emphasis added). The PA defines "Kingston Project" as "Shipper's [TVA's] proposed project to install gas-fired capability to Shipper's Plant, which includes the proposed 1,450 megawatt combined-cycle gas plant and the

natural gas pipeline to supply the units[.]" AR Doc. 524 at 55169. Section 9(B)(ii) read together with the definition of "Kingston Project" required as a condition precedent that TVA complete an environmental review for the construction of the Kingston gas plant and the gas pipeline and not any other alternative. Giving each material term its full meaning and reading all terms together, TVA would not have met this condition precedent and would have been under no obligation to perform on the contract without the completion of such an environmental review.

An interpretation of a contract that "gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect." Restatement (Second) of Contracts § 203(a). The Court misinterpreted section 9(B)(ii) as "merely require[ing] the issuance of a ROD—any ROD—in a timely manner and did not specify that the condition precedent to fulfilling the contract would be TVA issuing a ROD *choosing gas*." (Mem., Doc. 67 *SEALED* at PageID# 1226.) The Court then found that "no other condition precedent could be read as providing a means to terminate the contract should TVA choose a non-gas alternative." (*Id.*) Not only does the Court's interpretation of the condition precedent read out the material term "Kingston Project," its interpretation leads to an absurd result. It would require TVA to pay for, and ENTG to complete, a gas pipeline if TVA completed an environmental review for and chose a non-gas alternative for the replacement generation at Kingston.

Second, the Court found that "TVA violated NEPA's timing requirements through its" PA with ETNG "because it was precommitted to the decision before even beginning the NEPA Process and before writing its Draft EIS." (*Id.* at PageID# 1230.) The Court's recitation of the factual background discusses when the NEPA process started in relation to the signing of the PA (*id.* at PageID## 1201–04), but it is not specifically mentioned in the Court's analysis of this claim. And the finding that TVA "precommitted to the [gas plant] decision before even beginning the

NEPA process" (*id.* at PageID# 1230) is incorrect. TVA began the NEPA process on June 15, 2021, when it issued its Notice of Intent to prepare an EIS, which included the gas plant option and kicked off the Scoping Process involving the public. The PA was executed on August 12, 2021. The opinion does not explain why this timing was in violation of NEPA.

Third, this Court granted TVA's motion for summary judgment on Plaintiffs' claim three and ruled that the EIS took the requisite "hard look" at the environmental effects of its proposed action. (*See id.* at PageID## 1215–16.) Yet, in deciding Plaintiffs' predetermination claim, the Court found that TVA's precedent agreement with ETNG "prevented TVA from taking the requisite 'hard look' at the environmental consequences of its actions." (*Id.* at PageID# 1228.) The Court's holding cannot be reconciled with the holding that TVA *did* take the hard look required by NEPA.

Last, the Court's holding fails to take into account the complexities of a major infrastructure project, like the construction of a gas plant, where a component of that project is contingent on the work of a third party that cannot take on 100% of the project's risk (and is subject to a separate NEPA and permitting process). Essentially, Plaintiffs' position, which was accepted by the Court, is that federal agencies cannot commit resources towards a preferred alternative until they have reached some undefined point in the NEPA process. This is not a workable rule for large-scale infrastructure projects that are subject to NEPA.

**C. Vacatur**

As this Court correctly noted (*see* Mem., Doc. 67 *SEALED* at PageID# 1248), courts typically analyze two factors in determining whether to vacate an agency's decision: (1) "the seriousness of the . . . deficiencies [in the agency's decision] (and thus the extent of doubt whether the agency chose correctly)"; and (2) "the disruptive consequences of an interim change that may

itself be changed." *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993). Although it characterized the errors identified in the EIS to be "fundamental to the analysis" (Mem., Doc. 67 *SEALED* at PageID# 1248), this Court did not analyze the second *Allied-Signal* factor—the disruptive consequences of vacatur.[1] Given the circumstances presented here, outlined more fully in section II., *infra.*, the disruptive consequences of vacatur as a remedy are a vitally important part of the Court's equitable analysis, which heightens the necessity to evaluate the facts involved. *Cf. Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1290 (11th Cir. 2015) (rejecting environmental group's "argument that the potential disruption to the mining industry is irrelevant" to the analysis in determining whether vacatur was appropriate). A court cannot issue injunctive relief without examining the essential factors and absent briefing. And TVA specifically requested that separate briefing be allowed on the question of remedy. (*See* Doc. 61 at PageID## 14–15 ("TVA respectfully requests that, should the Court find that Plaintiffs prevail on any of their claims, it set a separate briefing schedule on the question of the appropriate remedy.").) As noted previously, Plaintiffs have *never* moved for injunctive relief during this case. And TVA did not have the opportunity to provide the Court with information related to the harm that will result from any delay to the Kingston gas plant's construction. Thus, there is a serious question as to whether the Court correctly granted vacatur as a remedy without having the necessary information to engage in the full inquiry. *Cf. Seven Cnty.*, 605 U.S. at 183 (criticizing NEPA's "transform[ation] from a modest procedural requirement into a blunt and haphazard tool employed by project opponents . . . to try to stop or at least slow down new infrastructure and construction projects").

[1] And neither did Plaintiffs. They made only the conclusory statement that "[a]ny disruptive consequences are outweighed by seriousness [sic] of TVA's errors, which are 'fundamental'" when they argued this matter for the first time on reply. (Doc. 56-1 at PageID# 1066.)

## II. A stay pending appeal is proper because TVA will be irreparably injured absent one.

In evaluating the harm that will occur if a stay is not granted, a court generally looks to three factors: (1) the substantiality of the injury alleged; (2) the likelihood of its occurrence; and (3) the adequacy of the proof provided. *Griepentrog*, 945 F.2d at 154. The harm alleged must also be both certain and immediate, rather than speculative or theoretical. *Id*.

Halting or suspending construction would significantly and adversely impact TVA's ability to reliably meet load demand within the TVA territory. (*See* Declaration of Clifton Lowry ("Lowry Decl.") at ¶¶ 9-10.)[2] The generating capacity expected to be provided by the Kingston gas plant is needed to meet projected demand for electricity and without it, the entire TVA territory will be at a high risk of power outages and rolling blackouts, particularly during periods of peak load demand. (*See id.* at ¶ 9.) If TVA is unable to provide adequate and reliable power, it is without question that TVA's customers will suffer irreparable harm. This also means that TVA would not be able to fulfill its statutory obligation to maintain reliability. *See, e.g.*, *Kentucky v. EPA*, No. 23-3216, 2023 WL 11871967, at *4 (6th Cir. Jul. 25, 2023) (concluding that the movant would face irreparable harm when the movant "provide[d] evidence that Kentucky residents will face higher prices and that Kentucky's power grid [would] face destabilization"); *Texas v. EPA*, 829 F.3d 405, 434 (5th Cir. 2016) (movant raised the threat of permanent closure of plants that could arise if a stay were not granted and concluding that "plant closure [and] the threat of grid instability and potential brownouts alone constitute irreparable injury").

The harm from an immediate stop-work order that lasts for an indefinite time extends beyond TVA and is also likely to have a significant adverse effect on the more than 2,000 hourly

---

[2] The Lowry Declaration is attached to this memorandum as Exhibit 1.

workers currently working at the Kingston Reservation. (*See* Declaration of Roger Waldrep ("Waldrep Decl.") at ¶ 5.)[3] If work on the Kingston project is halted for an indefinite amount of time, TVA would be forced to furlough or release the more than 2,000 skilled craft laborers currently working on the project. (*See id*.) This would leave these hourly employees without pay and, if they are released, without a job. (*See id.*) The income stream for these workers will therefore be adversely impacted by a work stoppage of any duration. (*See id.*) *Accord, e.g.*, *California Communities Against Toxics v. EPA*, 688 F.3d 989, 994 (9th Cir. 2012) (finding that vacatur of rule, which would halt construction of a power plant, would "be economically disastrous" because the project was "a billion-dollar venture employing 350 workers").

TVA will also be adversely impacted from losing these workers both in terms of loss of labor continuity as well as cost. (*See* Waldrep Decl. at ¶¶ 6–7.) Hiring back such a large number of qualified laborers will come at a significant cost to TVA and will impact TVA's ability to complete the project on schedule even if remobilization occurs. (*See id.* at ¶ 6.) The irreparability of this harm is heightened because the substantial costs TVA will have to spend to ensure contract performance guarantees and to rehire the qualified craft laborers who demobilized following a work stoppage will be unrecoverable. (*See id.* at ¶¶ 4, 7.) *Accord* Emergency Mot. for Stay Pending Appeal at 21–23, *Basinkeeper v. U.S. Army Corps of Eng'rs*, No. 18-30257 (5th Cir. March 2, 2018) (arguing that allowing injunction to stay in place during appeal would cause "up to $500,000 in standby labor costs alone"); *Basinkeeper v. U.S. Army Corps of Eng'rs*, 715 F. App'x 399 (5th Cir 2018) (granting Emergency Motion for Stay Pending Appeal). The Supreme Court has recently explained when granting a partial stay in *National Institutes of Health v. American Public Health Association* that although "the loss of money is not typically considered an irreparable harm, that

[3] The Waldrep Declaration is attached to this memorandum as Exhibit 2.

changes if the funds cannot be recouped and are thus irrevocably expended." 145 S. Ct. 2658, 2658 (2025) (quoting *Phillip Morris USA Inc. v. Scott*, 561 U.S. 1301, 1304 (2010)); *see also Commonwealth v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023) (noting that costs to comply with an order that are "unrecoverable" are irreparable, and that "the peculiarity and size of [unrecoverable compliance costs] affects its weight in the equitable balance, not whether it should enter the calculus at all"). As in *National Institutes of Health*, the costs TVA will be forced to expend in the event of a work stoppage cannot be recouped (*see* Waldrep Decl. at ¶ 4), and therefore constitute irreparable harm to TVA. *See National Institutes of Health*, 145 S.Ct. at 2658.

Plant equipment is also likely to be devalued and adversely impacted as a result of a work stoppage. The majority of the large equipment for the Kingston gas plant has already been delivered to the site and most manufacturers' warranties start to run upon delivery. (*See* Waldrep Decl. at ¶ 8.) A work stoppage of indefinite duration will impair the value of these warranties for any extended period of disuse a shutdown would cause. (*See id.*) The equipment itself may also deteriorate during a prolonged work stoppage, and that may result in an increased likelihood of early failure once it is installed. (*See id.*) Accordingly, a work stoppage is likely to have a significant monetary and operational impact on the gas plant even after the stoppage has been lifted. (*See id.* at ¶ 9.)

Finally, further delay in TVA's timeline to complete construction of the gas plant would impair TVA's ability to respond to and help address the energy emergency identified by the current administration. Executive Order 14156 declared a national energy emergency, proclaiming that "[t]he integrity and expansion of our Nation's energy infrastructure—from coast to coast—is an immediate and pressing priority for the protection of the United States' national and economic security." 90 Fed. Reg. 8433, 8433 (Jan. 20, 2025). And Executive Order 14154, "Unleashing

American Energy," made it national policy "to protect the United States's economic and national security and military preparedness by ensuring that an abundant supply of reliable energy is readily accessible in every State and territory of the Nation[.]" 90 Fed. Reg. 8353, 8353 (Jan. 20, 2025); *see also* Continuation of the National Emergency With Respect to Energy, 91 Fed. Reg. 1667 (Jan. 12, 2026) (continuing for one year the national emergency declared in Executive Order 14156). As a federal agency that generates electricity, TVA is especially key to fulfilling this mandate. If TVA cannot complete the gas plant, it is unable to support these policies. *Accord, e.g.*, *Save RGV v. Space Expl. Techs. Corp.*, No. 24-cv-00148, 2024 WL 5357188, at *4 (S.D. Tex. Nov. 21, 2024) (injunction could "impact national security by halting" or "delaying" programs "relied on by multiple government agencies").

Because this second "most critical" factor related to the stay analysis, *Nken*, 556 U.S. at 434, supports TVA's request, it weighs heavily in favor of granting a stay here.

## III. The issuance of a stay pending appeal will not substantially injure other interested parties.

Courts use the same test for irreparable harm to determine whether the issuance of a stay will injure other parties—substantiality, likelihood of occurrence, and adequacy of proof. *Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 977 (D.C. Cir. 1985), *abrogated on other grounds by Winter v. NRDC*, 555 U.S. 7 (2008).

Plaintiffs have not alleged that the building of the gas plant will be the cause of their injury. The injuries they cited in their complaint and the basis of their standing allegedly arise from the emissions that will be generated by the eventual operation of the gas plant. (*See, e.g.*, Compl., Doc. 1 at PageID# 10 ¶ 41 ("Air pollution from TVA's Kingston Gas Plant is likely to harm Ms. Steele's health and trigger her asthma, impairing her enjoyment of her recreational activities in the area.").) The Kingston gas plant has experienced construction delays and is unlikely to be commercially

operational until 2028. (*See* Waldrep Decl. at ¶ 4.) Thus, the harm identified by Plaintiffs and credited by the Court does not exist now and will not for at least another year. *See United States v. Lanier*, No. 2:14-CR-83, 2018 WL 3795961, at *6 (E.D. Tenn. Aug. 9, 2018) (finding no substantial harm would result from the grant of a motion to stay where the party opposing the stay had not submitted a "particular reason why they would suffer harm" from the stay). Moreover, the gas plant is subject to a Clean Air Act permit requiring that its emissions stay below certain statutory thresholds in order to protect human health and the environment. Given that this Court has already rendered a final ruling and TVA plans to pursue an expedited appeal in this matter, any minimally articulated injuries Plaintiffs could allegedly experience related to the running of the gas plant are unlikely to occur during this time period.

**IV. The public interest weighs in favor of granting the stay.**

The analysis of whether the public interest weighs in favor of granting a stay balances the impact of the grant or denial of the stay on the public at large with a specific focus on the correct application of the law at issue. *Commonwealth v. Biden*, 23 F.4th 585, 612 (6th Cir. 2022).

Initially, delay resulting from TVA's inability to proceed with construction harms the residents of the Tennessee Valley because it risks making TVA unable to reliably meet load demand. (*See* Lowry Decl. at ¶¶ 9-10.) If TVA is forced to reduce load, this will place the entire TVA territory at a high risk of power outages and rolling blackouts, particularly during periods of peak load demand. (*See id.*) Courts have routinely found that access to reliable electricity is in the public interest. *See, e.g.*, *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 18 (1978) ("Utility service is a necessity of modern life; indeed, the discontinuance of water or heating for even short periods of time may threaten health and safety."); *Texas v. EPA*, 829 F.3d 405, 435 (5th Cir. 2016) (recognizing "the public's interest in ready access to affordable electricity"); *Sierra Club v. Ga.*

*Power Co.*, 180 F.3d 1309, 1311 (11th Cir. 1999) ("[A] steady supply of electricity during the summer months, especially in the form of air conditioning to the elderly, hospitals and day care centers, is critical."); *Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc.*, 805 F.2d 351, 357 (10th Cir. 1986) (holding that public interest favored an injunction pending appeal when necessary to preserve power supply to the public).

Second, the thousands of craft laborers employed on the job at present would be furloughed or released from work completely if work had to cease. (*See* Waldrep Decl. at ¶ 5.) As hourly wage-earning employees, this would cause them and their dependents severe economic harm and uncertainty. (*See id.*)

Last, TVA has raised serious concerns with the interpretation and application of the law in this instance, and the public interest would be best served by a stay pending the outcome of an appeal to determine whether the law has been correctly applied. Thus, the public interest weighs in favor of staying the Court's decision pending appeal in this matter.

**CONCLUSION**

Because of the irreparable harm that will result should the Court's order require TVA to stop construction of the Kingston gas plant, TVA respectfully requests that this Court stay its decision pending TVA's appeal.

Respectfully submitted,

*s/Maria V. Gillen*

Maria V. Gillen (TN BPR 030655)
Associate General Counsel
F. Regina Koho (TN BPR 029261)
Lane E. McCarty (TN BPR 028340)
Steven C. Chin (TN BPR 030011)
OFFICE OF THE GENERAL COUNSEL
Tennessee Valley Authority
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1401
Telephone 865.632.7741
mvgillen@tva.gov

Attorneys for Tennessee Valley Authority

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was filed electronically through the Court's ECF system on the date shown in the document's ECF footer. Notice of this filing will be sent by operation of the Court's ECF system to all parties as indicated on the electronic filing receipt. Parties may access this filing through the Court's ECF system.

Amanda Rosemary Garcia, Esq.
O.W. Bussey, III, Esq.
Delaney King, Esq.
1033 Demonbreun St., Suite 205
Nashville, Tennessee 37203
615.921.9470
agarcia@selc.org
tbussey@selc.org
dking@selc.org

Gregory D. Buppert, Esq.
Elizabeth M. Putfark, Esq.
201 West Main Street, Suite 14
Charlottesville, Virginia 22902
434.977.4090
gbuppert@selc.org
eputfark@selc.org

*Attorneys for Plaintiffs*

*s/Maria V. Gillen*
Attorney for Tennessee Valley Authority